```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
PHARMACY, INC.,
```

    Plaintiff,           **MEMORANDUM & ORDER**

  -against-             Civil Action No. 05-776
                    (DRH)(AKT)

AMERICAN PHARMACEUTICAL
PARTNERS, INC.

    Defendant.
----------------------------------------------------------X

**Appearances:**

For the Plaintiff
**Rosenberg Feldman Smith LLP**
551 Fifth Avenue, 24th Floor
New York, New York 10176
By:  Michael H. Smith, Esq.

For the Defendant
**Morrison & Foerster LLP**
1290 Avenue of the Americas
New York, New York 10104
By:  Karen L. Hagberg, Esq.
   David J. Fioccola, Esq.

**HURLEY, Senior District Judge:**

   Plaintiff, Pharmacy Inc. ("Plaintiff" or "Pharmacy"), commenced this action against Defendant, American Pharmaceutical Partners, Inc. ("Defendant" or "APP"), seeking to recover for APP's alleged breach of contract. Presently before the Court is APP's motion for summary judgment. For the reasons set forth below, the motion is granted as to any claim for lost royalties for Steri-Temp but is otherwise denied.

*Background*

**I. Material Undisputed Facts**

The following material facts are undisputed unless otherwise noted.

On September 30, 2002, the parties entered into an asset purchase agreement (the "Agreement") whereby APP purchased from Pharmacy the domestic and foreign intellectual property rights for three pharmaceutical devices, Steri-Tamp, Steri-Temp, and Quali-Quick (collectively the "Products"). APP also purchased Pharmacy's existing Quali-Quick inventory. The Agreement provides that the laws of the State of Illinois shall govern its validity and construction.

Steri-Tamp is a dual layer seal used on, *inter alia*, vials, intravenous bags and syringes. It provides a visual warning to guard against repeat usage and tampering. Steri-Temp is a concept for a tamper evident seal that would change color based on temperature. At the time of the Agreement, Steri-Temp had not been developed into an actual product. Quali-Quick is a device used by pharmacists to test the sterility of drug admixtures.

Pursuant to the terms of the Agreement, the purchase price consisted of $1,250,000 to be paid at closing and additional payments of $1,000,000 and $750,000 when net sales for the Products reach $5,000,000 and $10,000,000 respectively.[1] APP agreed to use "commercially reasonable best efforts and commercially reasonable resources, personnel and financing to market and sell the Products." In addition to these cash payments, APP agreed to pay Pharmacy

---

[1] APP also agreed to pay for the cost of the existing Quali-Quick inventory which it purchased from Plaintiff as that inventory was sold.

5% of net sales for Steri-Tamp and/or Steri-Temp and 7% of net sales for Quali-Quick "for as long as [APP] markets and sells, sublicenses, distributes or otherwise deals in such Product[s]." APP was also required to pay a minimum royalty of $400,000 during the first two years of the Agreement. The Agreement defines "net sales" as follows:

> gross invoiced sales of Product by Buyer to its Customers, worldwide, net of chargebacks less, with respect to sales of Product: (a) discounts, credits or allowances, if any, given or made because of price adjustments; (b) actual replacements, returns or rebates (including but not limited to group purchasing organization fees and rebates and governmental rebates); (c) sales, excise and value added taxes paid by Buyer; and (d) freight and insurance to the extent included in the sales prices and actually paid by Buyer. The amount of the Net Sales for any period shall be determined in accordance with GAAP on the basis of sales recorded in the ordinary course on the books of the Buyer during such period, less the deductions provided for in this Section 1.6.

APP "launched" Steri-Tamp on March 18, 2004. According to APP, manufacturing and packaging problems plagued Steri-Tamp, as a result of which APP scaled back its marketing of Steri-Tamp. APP also claims that it could not lawfully sell the Quali-Quick inventory it purchased from Plaintiff because it was unable to verify that it was manufactured pursuant to the U.S. Food and Drug Administration's Good Manufacturing Practices. Plaintiff counters that manufacturing problems, which were the result of changes to the product made by APP, only affected samples and were corrected by the end of December 2004. Plaintiff further contends that although the only problems APP continues to address are the problems generated by APP's redesigned packaging which affect only one size of Steri-Temp seals, APP has pulled back its marketing and sales efforts for all sizes of Steri-Tamp. Finally, Plaintiff disputes that the purchased Quali-Quick inventory could not be sold. Assuming *arguendo* it could not be sold,

3

Plaintiff counters that such fact is (1) irrelevant to the instant motion and (2) does not explain why APP has not manufactured or sold its own Quali-Quick devices.

## II. The Allegations of the Complaint

Succinctly stated, Pharmacy claims that Defendant breached its obligations under the Agreement to use "commercially reasonable best efforts and commercially reasonable resources, personnel and financing to market and sell the Products." Pharmacy seeks to recover the following damages as a result of the alleged breach: (1) $1,750,000.00 representing the balance of the Asset Purchase Price; (2) $250,000.00 representing the value of the existing Quali-Quick inventory conveyed to APP; (3) "an amount to be proven at trial representing the Plaintiff's share of the Net Sales of the Products" and (4) costs, expenses and attorneys' fees incurred in this action. It is Plaintiff's claim for item number three –what the parties refer to as damages for lost profits[2] – that is the subject of the instant motion.

## *III.  The Issues Presented on the Current Motion*

For purposes of the current motion, Defendant does not dispute that the Agreement constitutes a valid contract between the parties or that a breach of the Agreement occurred. Rather, its arguments are solely limited to one of Plaintiff's claimed four sources of damages, to wit: lost profits. APP argues it is entitled to summary judgment (1) on any claims for lost sales of Steri-Tamp in Europe because the Agreement does not require APP to market and sell in Europe; (2) on any claims for lost profits of Steri-Temp and Quali-Quick based on the Illinois "new business rule;" and (3) for lost profits of Steri-Tamp and Quali-Quick as too speculative in

---

[2] The Court shall, for the most part, use the term "lost profits" as adopted by the parties. It notes, however, that Plaintiff's claim is for lost royalties and royalties are payable on "net sales" as defined in the Agreement and as such are not necessarily equivalent to "lost profits."

4

that Plaintiff's damages expert relied on unsupported assumptions provided by Plaintiff and failed to consider which portion of Pharmacy's Steri-Tamp damages were caused by APP.

*Discussion*

## I. Standard for Summary Judgment

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates both the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *See Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. See *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v.*

5

*U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted). Affidavits submitted in opposition to summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show that the affiant is "competent to testify to the matters stated therein." *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) (citing Fed. R. Civ. P. 56(e)). "Rule 56(e)'s requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertions that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial." *Patterson*, 375 F.3d at 219 (citing *Sarno v. Douglas Elliman-Gibbons & Ives Inc.,* 183 F.3d 155, 160 (2d Cir. 1999)).

When determining whether a genuinely disputed factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," or "the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 254-55. A district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide the district court in its determination of a summary judgment motion. *See Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if the moving party can point to an absence of evidence to support an

essential element of the non-movant's claim. *See id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish the claim, the burden shifts to the non-movant to offer "persuasive evidence that [the] claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587). In deciding a summary judgment motion, a court must resolve all factual ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987).

## II. The Geographical Scope of the Best Efforts Clause.

Defendant seeks summary judgment on any claim for lost sales of Steri-Tamp in Europe arguing that the Agreement does not require APP to market and sell Steri-Tamp in Europe.

In considering the terms of the contract, the Court employs a three-step inquiry: (1) determine whether the written contract is an integrated agreement; (2) if it is, determine whether the language of the written contract is clear; and, (3) if the language is clear, apply that clear language. *Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 293 F. Supp. 2d 397, 412 (S.D.N.Y. 2003) (citation and internal quotation marks omitted); *accord Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill.2d 457, 706 N.E.2d 882 (Ill. 1999) (where contract contains an integration clause and is facially unambiguous, the parties' intent must be determined from the four corners of the document without reference to extrinsic evidence).

Here, there is no dispute that the Agreement contains an integration clause. Rather, the dispute centers on whether the language of the contract is clear. APP argues that the Agreement creates no affirmative obligation on its part to market and sell the Products in Europe. Pharmacy argues that the Agreement requires Defendant to market and sell in Europe and worldwide.

7

Paragraph 6.2 of the Agreement provides that APP will use "commercially reasonable best efforts and commercially reasonable resources, personnel and financing to market and sell the Products." The provision itself contains no geographical limitation on those best efforts. Accordingly, the Court must next look to the other contractual provisions (as opposed to any evidence extrinsic to the Agreement) to see if they address the geographical scope of the Agreement. *Cf. Air Safety*, 185 Ill. 2d at 463 (only when language of contract is susceptible to more than one meaning may parol evidence be admitted to aid the trier of fact in resolving the ambiguity).

APP argues there are only three provisions that even mention geographical terms, and that none create an obligation to sell the products in Europe. According to Defendant, "Two provisions address issues peripherally related to sales and contemplate only the United States as a market. (*See* §§ 1.8, 9.4)." [Mem. of Law In Supp. of APP's Motion for Summary Judgment ("APP's Mem.") at 23.] These two provisions are "Section 1.8 [which] defines 'regulatory approvals' as those issued by the U.S. Food and Drug Administration. The agreement requires Pharmacy to transfer any such existing approvals to APP. Section 9.4 requires APP to obtain product liability insurance coverage from an insurer licensed to do business in the United States." *Id.* at 23 n.12. According to APP, the third, Section 1.6, defines the term "net sales" as encompassing sales of Steri-Tamp "worldwide." APP argues that this "definition's only logical interpretation is that it ensures that Pharmacy is entitled to royalties derived from any sales of Steri-Tamp, wherever they occur. The term creates no affirmative obligation that APP market Steri-Tamp in Europe." *Id.* at 23.

Pharmacy, on the other hand, argues that the parties' intent as to the worldwide

8

geographical scope of APP's best efforts is evident in that the Agreement provides "(1) for Pharmacy to receive royalties on 'worldwide' sales, (2) for 'value added taxes' (VAT) to be deducted from the 'net sales' calculation and VAT is only assessed abroad, and (3) in exchange for royalties on 'worldwide sales' defendant was assigned all 'foreign and domestic' patents and trademarks and rights to market Steri-Tamp worldwide." [Plaintiff's Mem. of Law in Opp. to Def.'s Motion for Partial Summary Judgment ("Pl. Mem.") at 2.]

The Court finds that neither the regulatory approval provision nor Section 9.4 necessarily evidences any intent to limit the geographic scope of the best efforts clause to the United States. Section 4.6 merely provides that Pharmacy "has obtained and possesses all Regulatory Approvals necessary to manufacture (or have manufactured) and market and sell the Products in the United States." The sellers representation that it had obtained approvals from the FDA does not *a fortiori* limit the scope of the Agreement to the United States. Rather, it may merely reflect that Pharmacy had not received regulatory approvals necessary to market the Products outside the United States. Similarly, section 9.4's requirement that APP maintain product liability insurance with an insurer licensed to do business in the United States and naming Pharmacy as an additional insured does not limit the geographic scope of the best efforts clause. Again, the requirement of an insurer licensed in the United States may merely be tied to Pharmacy's status as a Florida corporation with offices in New York.[3]

Rather, the Court finds indicative of the geographic scope of the "best efforts" clause the Agreement's requirement of royalties on "net sales" and the contractual definition of net sales as

---

[3] This information is contained in the Agreement itself, which recites Pharmacy is a Florida corporation and requires that notices to Pharmacy be sent to its offices in Woodmere, New York.

"gross invoiced sales of Product by Buyer to its customers, *worldwide*, net of chargebacks less, with respect to sales of Product: . . . (c) sales, excise and value added taxes paid by [APP] . . . ." (emphasis added.) When the net sales definition is considered together with the fact that the intellectual property transferred to APP included not only domestic but foreign rights to said intellectual property, the four corners of the Agreement evidence a clear intent to require APP to use its best efforts "worldwide, " which naturally would include Europe.[4]

Accordingly, APP's motion for summary judgment on APP's claim for lost profits based on APP's failure to market and sell Steri-Tamp in Europe is denied.

### III. *The Illinois New Business Rule*

APP also argues it is entitled to summary judgment on any claims for lost profits of Steri-Temp and Quali-Quick based on the Illinois "new business rule."

The party claiming damages bears the burden of proving those damages to a reasonable degree of certainty. *See In re Estate of Halas*, 209 Ill. App. 3d 333, 568 N.E.2d 170 (Ill. App. Ct.1991). "[I]n the specific context of lost profits damages, Illinois courts have stated that 'lost profits will be allowed only if: their loss is proved with a reasonable degree of certainty; the court is satisfied that the wrongful act of defendant caused the lost profits; and the profits were reasonably within the contemplation of the defaulting party at the time the contract was entered into.'" *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 632 (7th Cir. 2007) (quoting *Milex Prods., Inc. v. Alra Labs, Inc.*, 237 Ill. App. 3d 177 (1992). Where "the profits arise out of a breached contract, those profits are considered an element of the contract and thus, within

---

[4] That Plaintiff seeks only lost royalties from Europe, and not from any other international market, is not relevant to the determination of whether the four corners of the Agreement is clear and unambiguous as to the geographic scope of the best efforts clause.

the contemplation of the parties at the time the contract was established; these damages are recoverable if proved to a reasonable degree of certainty." *Id.*

A sub-rule of the requirement that damages for lost profits be proven to a reasonable degree of certainty is what is commonly referred to as the "new business rule" Under the new business rule, "as a general rule, expected profits of a new commercial business are considered too uncertain, specific and remote to permit recovery." *Id.* at 633; *see Stuart Park Assocs., Ltd. P'ship v. Ameritech Pension Trust*, 51 F.3d 1319, 1328 (7th Cir. 1995). *See generally BEM I, L.L.C. v. Anthropologie, Inc.*, 301 F.3d 548, 555 (7th Cir. 2002) (noting that the new business doctrine is "hoary principle" with "vague" . . . "outer limits" and with the purpose of "limit[ing] the speculative element in estimating lost profits). The rationale for the rule is that new businesses lack a track record of actual profits. *See Sk Hand Tool Corp. v. Dresser Indus. Inc.*, 284 Ill. App. 3d 417, 427, 672 N.E.2d 34 (Ill. App. Ct. 1996).

Here, APP argues that because Steri-Temp never got beyond the concept stage and because Quali-Quick had been on the market for less than six months, the new business rule entitles it to summary judgment on any lost profits for these two products. [Def. Mem. at 18-21.] Plaintiff does not dispute the application of the new business rule to Steri-Temp.[5] Accordingly, as to Steri-Temp, the motion for summary judgment on any claim for lost profits is granted.

Turning to Quali-Quick, Plaintiff claims the new business rule is inapplicable. First, Plaintiff argues that Quali-Quick is not a new business or a new product because it was selling on the market for over eight years at the time APP purchased it from Pharmacy. According to

---

[5] It would appear that Plaintiff has made no claim for lost profits with respect to Steri-Temp.

11

Plaintiff, Quali-Quick was first manufactured and sold in 1993 by IV Plus, a company in which Messrs. Feigenbaum and Meadow (the two current shareholders of Pharmacy, Inc.) were shareholders, and has been on the market since that time. In 1994, IV-Plus entered into an agreement with a company called Solo-Pak, which lasted until 1996, whereby Solo-Pak sold Quali-Quick and paid royalties on these sales. Second, although conceding that sales of Quali-Quick were "de minimis" for the period 1996 to 2000, Plaintiff points to the fact that it began selling Quali-Quick in 2001 and generated sales of close to $100,000 in the four to five months prior to September 2002 when it sold Quali-Quick to Defendant. Finally, Plaintiff relies on Defendant's projections for the sales Quali-Quick would generate.

Fundamentally, the Court questions whether the Illinois new business rule is applicable to Plaintiff's damages claim. As noted *supra*, Plaintiff's claim is technically not for lost "profits" which generally refers to the excess of revenues over outlays in a given period of time, including depreciation and other non-cash expenses and is often synonymous with "net profit." Rather, Plaintiff's claim is for lost royalties, the calculation of which is not dependent on profits. None of the cases cited to this Court involve the application of the new business rule to a claim for lost royalties. It would appear that the reason for the new business rule, to wit that "a new business has yet to show what its profits actually are," *SK Hand Tool*, 284 Ill. App. 3d at 427, does not apply to this case since Plaintiff's claim for royalties is not dependent upon "profits."

Even assuming the new business rule is applicable to a claim for lost royalties, the question is whether Quali-Quick is a "new business" or "new product" for purposes of the rule. As one court has noted, "[f]or summary judgment purposes, then, the [new business] rule applies only if there is no genuine factual dispute that the [business at issue] would have been a new

12

business." *Alper v. Altheimer & Gray*, 2002 WL 31133287, at 41 (N.D. Ill. 2002). Here, drawing all inferences in favor of the non-moving party, "the court concludes that factual questions on this point remain in dispute." *Id.* APP points to no cases establishing the minimum amount of time that a business or product must operate to no longer be considered "new." There are cases in which projections based on periods of three, five and six months of operations have been held sufficient to prove lost profits to a reasonable degree of certainty. *See, e.g., Mfg. Research Corp. v. Greenlee Tool Co.*, 693 F.2d 1037 (11th Cir. 1982) (six months); *Spinett Inc. v. People's Natural Gas. Co.*, 385 N.W.2d 834 (Minn. App. 1986) (five months); *Petty v. Weyerhaeuser Co.*, 288 S.C. 349, 342 S.E.2d 611 (S.C. App. 1986).[6] Here, Plaintiff's projections are based on five months worth of sales, as well as Defendant's own projections regarding Quali-Quick sales.

The Court cannot hold that, as a matter of law, the new business rule applies to bar Plaintiff's claim for lost royalties on Quali-Quick sales. Accordingly, that portion of APP's summary judgment motion is denied.

### IV. *Plaintiff's Evidence of Damages is Sufficient to Survive Summary Judgment.*

APP's third argument in support of its motion for summary judgment is that Pharmacy's lost profits damages for Steri-Tamp and Quali-Quick are too speculative because Pharmacy's damages expert (1) relied on unsupported assumptions provided by Pharmacy and (2) failed to

---

[6] The Court recognizes that the cited cases did not involve the new business rule. Nonetheless, they are instructive as to the fact that damages for "lost profits" can be established to a reasonable degree of certainty with relatively short periods of time as a back drop.

consider which portion of Pharmacy's Steri-Tamp damages were caused by APP.[7]

### A. APP's Failure to Include Any "Assumption" Information In Its 56.1 Statement

Rule 56.1 of the Local Rules for the Eastern District of New York requires, in pertinent part:

> (a) Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement, ***in numbered paragraphs***, of the material facts to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion.
> . . .
> (d) Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e).

Rule 56.1 of the Local Rules of the Southern and Eastern Districts of New York.

Pursuant to Local Rule 56.1, the movant is required to include not just some but all of the facts material to its motion that movant contends are undisputed, properly supported by citation to evidence. "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001). Here, APP did not include any statements in its 56.1 relevant to its argument that lost profits damages for Steri-Tamp and Quali-Quick are too speculative because Pharmacy's damages expert relied on unsupported assumptions provided by Pharmacy. On this basis alone,

---

[7] On this motion, APP does not challenge the admissibility of the expert report opinion pursuant to the standard set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and it progeny.

that portion of APP's summary judgment motion should be denied. *See Holtz*, 258 F.3d at 73 (acknowledging district court's discretion to enforce or overlook a party's failure to comply with requirements of local court rules).

**B. Sufficient Evidence Exists to Support the Damages Expet's Assumptions**

However, having hunted through the voluminous records submitted by the parties, the Court finds, as detailed below, that (1) APP has not sustained its burden of showing there is insufficient evidence to support the assumptions used by Plaintiff's damages expert and (2) APP's contentions that the assumptions are unfounded goes to the weight of the testimony, a question for the jury in this matter to decide. *Cf. Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or in essence an apples and oranges comparison, other contentions that the assumption are unfounded go to the weight, not the admissibility of the testimony.").

Plaintiff's expert, Patrick A. Gaughan, PhD, was asked to "provide a projection of the losses incurred by Pharmacy, which are a function of the lost royalties that the plaintiff asserts should have been paid on the sales of Steri-Tamp and Quali-Quick by [APP]." [Gaughan, Patrick A., Loss of Royalties to Pharmacy, Inc. Associated with the Sales of Steri-Tamp and Quali-Quick ("the "Report")[8] at 3.] The measure of damages contained in the Report is "based upon the incorporation of specific assumptions that have been used by APP in its own projections. . . . Other assumptions have also been provided by counsel for Pharmacy . . . ." *Id.*

---

[8] A copy of the Report is Exhibit C to the Declaration of David J. Fioccola, dated December 1, 2006 ("Fioccola Declar.").

Dr. Gaughan assumed a market size for Steri-Temp in the United States of $22 million. That assumption is based upon APP's own projections. He then projected sales using three different assumptions regarding Steri-Temp's penetration of the market for IVA Seal, the market leader in the tamper-evident seal market. The low scenario assumes a market penetration in 2003 of 26%, increasing to 50% by 2007. The medium scenario assumes a market penetration of 29 % in 2003, reaching 50% by 2007. The high scenario assumes market penetration of 35% in 2003 reaching a high of 50% by 2006.

Dr. Gaughan's models are similar to models prepared by APP's own marketing director, which were relied upon by APP both in its decision to purchase Steri-Tamp and in its planning activities. According to the testimony of APP's Vice President of Marketing, "These are the models that we moved to after we stopped working with the model that relied on the AHA statistics . . . and were "based on the market research that we did, the qualitative market research, input that [APP] received from GPO's . . . [A]lso [Pharmacy] had given us some of its previous customer sales data."  In June 2006, APP's marketing vice president was asked, with respect to these models:

> Q. Has any information come to your knowledge that makes you question the accuracy of any of the estimated sales prices, estimated units or the total revenue on these models?
>
> A. I am comfortable that these models are somewhere between the low and the high scenario, that the market potential is somewhere in between there.

Deena Reyes Dep. at 230.[9]

APP argues that Dr. Gaughan's report cites only the AHA data and given that "APP

---

[9]Ms. Reyes' deposition is Ex. H to the Fioccola Decl.

discarded all forecast models based on AHA data because the data was unreliable," Dr. Gaughan's report is unreliable. However, Dr. Gaughan's deposition testimony makes clear that other projections regarding market size were reviewed as well. *See* Gaughan Dep. at 83-85. In fact, Dr. Gaughan, when confronted with the testimony that APP walked away from the AHA data because it had no basis and asked if it altered his reliance on that data, responded: "One, I am aware that APP apparently did other forecasts after this, even as far as 2004, which put forward somewhat comparable numbers. So I'm not sure then how that could mean that they have walked away from it." *Id.* at 90-91.

With respect to Dr. Gaughan's Quali-Quick calculations and the European market for Steri-Tamp, Pharmacy points to other APP projections which support Dr. Gaughan's figures.[10]

A plaintiff may use the defendant's prelitigation projections of sales or profits in establishing damages of lost sales or profits. *See Sir Speedy Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992)*; Care Travel Co. v. Pan Am. World Airways, Inc.,* 944 F.2d 983 (2d Cir. 1991); *Perma Research & Dev. Co. v. The Singer Co.*, 402 F. Supp. 881, 899 (S.D.N.Y. 1975), *aff'd*, 542 F.2d 111 (2d Cir. 1976) (using figures for projected sales which were relied upon by second assignee in entering contract for determining amount which first assignee had lost under contract which called for it to receive a percentage royalty). In this case, APP's projections provide a sufficient basis on which to base Pharmacy's calculation of lost royalties. Any flaws in that calculation or the assumptions on which the calculation is based, go to the weight to be given to that calculation, an issue not appropriate for summary judgment.

---

[10] Whether Dr. Gaughan actually relied on these projections is irrelevant to the instant motion which is premised on the alleged absence of evidence to support Pharmacy's damages calculation.

### C. The Issue of Causation

APP also argues that the evidence of damages is insufficient because Dr. Gaughan did not analyze the issue of whether it was APP's alleged failure to use "best efforts" or other factors that caused Steri-Tamp's lack of success in the market. However, Dr. Gaughan testified that causation was not an issue for him as an economist. Moreover, based on the submissions, there are questions of fact relating to whether any or all of the alleged lost sales were caused by the lack of best efforts or by other factors such as manufacturing difficulties or the entry into the market of Secure Seal.

Defendant's motion for summary judgment on the ground that the evidence supporting lost royalties is too speculative is denied.

### *Conclusion*

For the reasons set forth above, APP's motion for summary judgment is granted as to any claim for lost royalties on Steri-Temp but otherwise denied.

**SO ORDERED.**

Dated: Central Islip, New York
September 14, 2007

/s/
Denis R. Hurley
Senior District Judge